**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **J&M ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 07-0883-CG-C** |
| | ) | |
| **MARK C. CALLAHAN, d/b/a** | ) | |
| **CALLAHAN FINANCIAL SOLUTIONS,** | ) | |
| **et. al.,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |

## ORDER

On December 21, 2007, J&M Associates Inc. ("J&M") brought a lawsuit against Mark C.

Callahan d/b/a Callahan Financial Solutions, Lalat Pattanaik d/b/a I.P.S. Private Advisors, Brady

Richardson d/b/a Richardson Consultants, J. Michael Mangawang, Fredrick A. Romero, and

American General Life Insurance Company ("AIG") alleging breach of contract, negligence,

wantonness, fraud, fraudulent concealment, and civil conspiracy relating to J&M's enrollment in

a welfare benefit plan that ultimately led to "huge tax liability and penalties." (Doc. 1). On

April 3, 2010, this court entered default against Brady Richardson d/b/a Richardson Consultants,

J. Michael Mangawang, and Fredrick A. Romero for failure to plead or otherwise defend the

action. (Doc. 47). On June 15, 2010, Mark Callahan d/b/a Callahan Financial Solutions, Lalat

Pattanaik d/b/a I.P.S. Private Advisors, and Brady Richardson d/b/a Richardson Consultants

were dismissed with prejudice. (Docs. 148, 153, & 154). This matter is now before the court on

AIG's amended motion for summary judgment (Doc. 159), J&M's response (Doc. 170), AIG's

reply (Doc. 192), and J&M's supplemental brief (Doc. 197).[1]

## FACTS

AIG "is the world's leading international insurance and financial services organization,

with a history of more than 80 years in the two largest of its four principal businesses: General

Insurance and Life Insurance." (Doc. 181-1, p. 3). AIG had previously developed a life

insurance policy entitled the Platinum Value Master 5 or "VM5." (Doc. 178-1, pp. 7-8; Doc.

181-1, p. 7). A VM5 policy is "a whole life insurance product" modified for use in certain

financial concepts. (Doc. 171-1, Lalat Dep., p. 9). In other words, a VM5 policy "can be

purchased with tax-deferred dollars if you choose to purchase it in your qualified retirement

plan" and "may be used to provide valuable life insurance protection while absorbing excess

funds." (Doc. 181-1, p. 7). The VM5 policy was developed, in part, for use in "419 plans."

(Doc. 171-3, Lalat Dep., p. 40). As explained by J&M's expert, a plan under Internal Revenue

Code § 419A(f)(6) can consist of a trust with a custodian that operates and administers the plan,

and the trust can be a tax exempt Voluntary Employers Benefit Association trust under IRS Code

§ 509(c)(9). (Doc. 180-2, Bass Dep., p. 36-37). Section 419 specifically provides for

contributions to welfare benefit plans. (Id., pp. 37-38). The welfare benefit plan at issue here is

a Voluntary Employers Benefit Association plan for California Building Supply Wholesalers and

Contractors League ("VEBA Plan").

---

[1] While J&M's supplemental brief was stricken by this court's order dated October 5, 2010, this court will consider the arguments in the supplemental brief that specifically address the arguments found in AIG's reply. Therefore, J&M's motion for reconsideration of this court's order striking its supplemental brief is moot.

There are seven levels of AIG agents.  (Doc. 180-1, Childs Dep., pp. 23-25).  Levels 1 through 3 are associated with producer contracts, levels 4 through 6 are for general agent contracts, and level 7 is a master general agent contract, the highest level in the hierarchy.  (Id.).  A master general agent "is one who recruits [agents] in addition to sell [life insurance], if they so choose."  (Id., p. 3).  A master general agent can market an insurance policy, like the VM5 policy, by use of an AIG appointed agent without seeking further approval from AIG.  (Id., pp. 26-28).

Innovative Private Strategies & Insurance Services, Inc. ("Innovative") has a master general agent contract with AIG.  (Id., p. 22; Doc. 181-2, p. 1).  That contract was signed by Laban Pattanaik ("Laban").  (Doc. 181-2, p. 1).  Laban is the 100% owner of Innovative and was himself appointed by AIG as a general agent in 2001 and as a Level 7 master general agent in February 2004.  (Doc. 170, Lalat Dep., p. 4; Doc. 181-3).  Laban is also a 50% owner of a limited liability company named I.P.S. Private Advisors ("IPS").  (Doc. 171-1, Lalat Dep., p. 3; Doc. 173-1, Lalat Dep., 29).  Innovative, which did not market VEBA or employee benefit plans, would retain the services of IPS to market VEBA plans.  (Doc. 171, Lalat Dep., pp. 7-8).  Innovative would "informally" retain Lalat Pattanaik ("Lalat"), who is Laban's brother and an employee of IPS, to "market... concepts for business owners" like VEBA plans.  (Doc. 171-1, Lalat Dep., pp. 5-6).  Generally, once a client enrolled in a VEBA plan, the life insurance policy was sold to fund that plan and AIG paid commission to Innovative and/or Laban.  (Id., p. 8).  From the AIG commission, Innovative paid Lalat a fee and all marketing expenses.  (Id.).

Starting in or around 2001 or 2002, Lalat had discussions with AIG personnel "[o]n an ongoing basis... and extensively" about the financial concepts he marketed.  (Doc. 171-1, Lalat. Dep., p. 11).  Lalat testified that he has spoken with the following people at AIG:  Chuck Clark,

Royce Imhoff, who was the president of AIG "for some time", Dennis Roberts, who is the "chief CMO and then chief distribution officer"; Larry O' Brien, who is "[o]ne of the top three executives at [AIG]"; David Robinson, who is senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group; Walt Rudecki, who was an attorney "counterpart to David"; and Rod Martin, who was the head of AIG "life insurance worldwide." (Id., pp. 11-12; Doc. 172-1, Lalat Dep., p. 25; Doc. 178-1, Robinson Dep., p. 10). Lalat, his brothers, and staff also met regularly with Peter Mordin, who is the National Marketing Director for AIG. (Doc. 172-1, Lalat Dep., p. 17; Doc. 182-1, p. 11), and Lalat testified that Peter Mordin and David Robinson were not only aware of and never objected to Lalat's marketing strategy but also they allowed Lalat to use AIG-generated marketing materials and software in his marketing. (Doc. 173-1, Lalat Dep., p. 6-7, 12, 21-23).

Lalat also testified that AIG would request "plan documents, IRS determination letters, historical audits of the programs [he would be marketing], and then on an ongoing basis from time to time they requested certain things" from Lalat and that AIG provided an advisors guide, which included a section on VEBA plans and which "was probably the most significant marketing piece" Lalat used. (Doc. 171-1, Lalat Dep., pp. 17-18 & 25-26). He also testified that AIG has provided him and Innovative with numerous other marketing publications for VEBA plans. (Doc. 172-1, Lalat Dep., p. 19 & 29-30; Doc. 182-1, p. 19). Moreover, he testified that over a ten year period, AIG was associated with or financed all but one of the VEBA plans or employee welfare benefit plans that Lalat had marketed. (Doc. 173-1, Lalat Dep., p. 19). Lastly, Lalat maintained that AIG never objected to or refused to provide funding if the clients were insurable. (Id., p. 20).

David Robinson has had several different roles with AIG, serving as "senior counsel, tax attorney and a product tax attorney" before he "went into advanced sales, advanced sales counsel." (Doc. 178-1, Robinson Dep., pp. 2-3). As an advanced sales counsel, he worked "with some of the marketing and business leaders in developing" and worked "with products and assisting agents who were selling insurance to their clients and sophisticated estate planning, tax plans" like the VM5 plan. (Id., p. 3). Robinson worked under Royce Imhoff, who was the chief executive officer of the independent distribution, and Dennis Roberts, who was the chief distribution officer of the independent distribution. (Id., pp. 5-6). In or around August 2002 or 2003, after being promoted to counsel in advanced sales, Mr. Robinson was introduced to Lalat by Peter Mordin because Mordin "was introducing [Mr. Robinson] to various agents and agencies because [he] had recently changed positions within the company." (Id., pp. 9-12).[2] Mr. Mordin had informed Mr. Robinson that the Pattanaiks' firm, IPS, was "in the insurance business selling insurance to upscale, affluent people." (Id., p. 13). Mr. Robinson determined that IPS would benefit AIG because AIG "sold insurance" and "[t]hey were going to distribute [AIG's] product" since "[t]hey were an agent." (Id., p. 14). Mr. Robinson thereafter was in communication with Innovative and Lalat about the products they were marketing and selling including the VEBA plan and the VM5 policy and admitted that AIG benefited from IPS selling AIG products. (Id., pp. 16-19).

The VEBA product which J&M ultimately became a participant in was administered by a company called Sea Nine Associates, Inc. ("Sea Nine"). (Doc. 173-1, Lalat Dep., p. 11). Kenneth Elliott was an employee of Sea Nine and the administrator of the VEBA plan involving

---

[2] Mr. Mordin specifically introduced the Pattanaiks "as agents who were doing business with the company." (Id., p. 20).

J&M.  (Id.).  Mr. Elliott served two roles in regards to the VEBA plans: one as "the servicing producer" and the other as "the writing producer".  For those roles, he received a 15% commission.  (Doc. 180-1, Childs Dep., pp. 7-8).  Lalat testified that AIG was aware that Ken Elliott was involved in the administration of the VEBA plans and that "[t]hey had direct communication from time to time with him."  (Doc. 173-1, Lalat Dep., p. 32).  Lalat testified that during the time at issue in this case, he did not market any VEBA plans without Innovative or Ken Elliott "having knowledge of it."  (Doc. 173-1, pp. 18-19).

In or around July 2003, Mr. Robinson learned that "the IRS had promulgated regulations under 419A(f)(6) of the Internal Revenue Code."  In layman's terms, the IRS attempted "to set a set of guidelines for a compliant plan" but there were still "certain things that were left unresolved and gray that made it very difficult for plan operators to design a plan with certainty."  In particular, one of these gray areas was "[c]ontribution limits."  Mr. Robinson testified that his "understanding of it would be where plans distribute assets out of the plan and do it in a manner as that it is a mimic for deferred compensation.  It's really deferred compensation.  And if a plan is designed in such a way that a participant can withdraw money from the plan, that there is a possibility that it will be deemed deferred compensation and it would disqualify . . . the plan. " (Doc. 178-1, Robinson Dep., pp. 22-23).  Upon learning that the IRS had established final regulations, AIG attempted to determine if the VEBA plans being marketed were in compliance with these final regulations.  (Id., pp. 24-25).

David Robinson asked Peter Mordin who in turn asked the Pattanaiks to supply AIG with compliance information.  (Doc. 171-1, Lalat Dep., pp. 33-34).  Lalat testified that he had an "ongoing concern" that the VM5 policy was out of compliance, and that he expressed this concern to AIG.  (Doc. 172-1, Lalat Dep., p. 18).  On or around September 5, 2003, Mr. Elliott

of Sea Nine provided Mr. Robinson a letter which reflected Mr. Robinson's compliance request, with a memorandum to Lalat and his father from J. Michael Mangawang, who is Sea Nine's ERISA advisor, relating to the final 419 regulations. (Doc. 173-1, Lalat Dep., pp. 13-14; Doc. 183-1, pp. 1-8). In his letter to Mr. Robinson, Mr. Elliott states that "[w]e would like to engage a major law firm to thoroughly analyze numerous items associated with our plan and the impact of the regulations..." (Doc. 183-1, p. 2). On November 15, 2003, Lalat notified Mr. Mordin and Mr. Robinson by e-mail that the plan was being reviewed by Bruce Ashton of the Reish law firm, a firm that was recommended by AIG. (Doc. 173-1, Lalat Dep., pp. 15; Doc. 171-1, Lalat Dep., p. 35; Doc. 183-1, p. 9). On November 17, 2003, David Robinson emailed Lalat that AIG was placing the VEBA trust on an updated list of acceptable plans for placement of insurance products but that he still needed to see the compliance documents by January 2004. (Doc. 183-1, p. 9; Doc. 173-1, Lalat Dep., p. 16).

On or around January 27, 2004, Lalat helped prepare a letter to Mordin in response to Robinson's compliance request and as an "ongoing effort[]" to keep AIG apprised of the developments regarding plan compliance. (Doc. 171-1, Lalat Dep., p. 31-32; Doc. 183-1, pp. 12-14). The letter provided that:

> As you are aware, we have been developing a long-term alliance with AIG American General over the last 2+ years with the hopes of
>
>> 1. generating substantial business in the dynamic area of qualified multiple employer welfare benefit plans and
>>
>> 2. eventually expanding the distribution channels for our plans with the assistance of the Affluent and Corporate Markets Group and its agents.
>
> Because of our interest in a stable long-term strategic alliance with your group, we wanted you and your agents to be comfortable and supportive of our programs. In order to facilitate this, we decided to engage a major law firm… whose opinions were highly regarded by AIG…. Consequently, because of our discussion with you and David Robinson… we decided to engage Reish Luftman

Relcher & Cohen ("Reish") – a firm that was already of counsel to your company…

As a result of the final 419 regulations which were released in 2003, we felt that Reisch should evaluate the structure and operations of our programs in light of these regulations to ensure continued compliance. We also wanted them to reaffirm that we are a plan under ERISA as currently operated. Both of these items are very significant in sustaining the deductibility of employer contributions to our program. They are also critical to differentiating our programs from the non-qualified "419" plans which claim that they do not fall under the guidelines, and therefore do not have to meet such standards and restrictions." As you can see, Reish's opinion is to the contrary…

We have attached herewith the initial draft letter provided by Reish.

(Doc. 183-1, pp. 12-13).

The attached Reish law firm draft letter stated that Ken Elliott, on behalf of Sea Nine, asked Reish "to address whether the several [VEBAs] administered by Sea Nine Associates conform to the requirements set forth in Treasury Regulations under Internal Revenue Code… sections 419 and 419A ("the 419 Regulations"). You have asked us to consider whether the VEBAs are exempt from the 419 Regulations."   (Doc. 183-1, p. 15).  Reish first concluded that "[b]ecause the Plan and Trust do not contain provisions required under the new 419 Regulations, the VEBAs do not currently meet the requirements of the 419 Regulations."  (Id., p. 16).  Reish also concluded that the VEBAs were not exempt from the 419 Regulations.  (Id., p. 17).  In sum, Reish maintained

In short, the VEBAs are subject to two sets of regulation[s] under both ERISA and the requirements of the Code applicable to arrangements exempt from tax under Code section 501(c)(9).  In addition, the employers who sponsor and contribute to the VEBAs are subject to the limitations or lack thereof on the deductibility of their contributions under Code section 419 and 419A without regard to whether the plans are subject to ERISA.

(Id., p. 18).

On January 30, 2004, IPS sent a letter to Peter Mordin stating that in light of opinion letter from Reish, they will amend "[o]ur plan documents and some operational aspects of our

program… accordingly" and that "[w]e will notify you of the changes and make available the final documents resulting from their recommendations – when they become available." (Doc. 183-1, p. 20). The letter also stated that IPS plans "on maintaining an 'open book approach, and making transparent to your team, any structural, operational and documentation changes that Reish recommends.'" (Id.). Mr. Robinson testified that he and the company never received a full response from Mr. Elliott or anyone else about the compliance of the Sea Nine VEBA plans, and he notified Mr. Modin and Mr. Imhoff that he had been asking for compliance and had not received a full response concerning these plans. (Doc. 178-1, Robinson Dep., pp. 27-28 & 34-35).[3]

J&M is a "Mississippi corporation with its principal place of business located in Moss Point, Jackson County, Mississippi" and "is engaged in the business of leasing employees and providing services to industrial and marine clients." (Doc. 1, p. 2). John and Mike Wilks are the owners of J&M. The Wilks first learned about the VEBA plan concept in October 2003 from G. B. Taylor of Point Clear Insurance Services, and Mr. Taylor had previously heard of the VEBA plan concept from Mark Callahan. (Doc. 159-4, J. Wilks Dep., p. 3-4; Doc. 183-2, Taylor Aff., pp. 10-11). Mark Callahan is a Level 1 appointed agent who is authorized to sell fixed and variable insurance policies including the VM5 policy in Mississippi and Alabama. (Doc. 180-1, Childs Dep., pp. 20-21).

In early 2004, John, Mike, and their father Billy Wilks met with Mr. Callahan. (Doc. 159-5, B. Wilks Dep., p. 4). At that meeting, Mr. Callahan "told [the Wilks] about the VEBA

_____

[3] In February 2004, Robinson's position was eliminated by senior management, and he became counsel of another distribution or profit center called Independent Advisors Network. (Id., pp. 29 & 36). However, Robinson testified that if the compliance documentation had been sent to him at AIG, it would have been directed to him or forwarded to Mr. Imhoff who was the "business leader of that profit center or that division". (Id., p. 30).

plan and explained how it worked, and that it was – involved with AIG.  And he… hit the high

spots… at that particular meeting."  (Doc. 176-1, B. Wilks Dep., p. 4).  Specifically, he told them

"the purpose [of the VEBA plan] was to generate a retirement for the participants and that it

would be tax exempt going in and coming out" but "[h]e didn't really get into the details of that

part of it at that time."  (Id., p. 5).

After a couple of telephone conversations, the Wilkses had a second meeting "a week or

two later" with Mr. Callahan at his office "because [Mr. Callahan] had told [the Wilkses] that he

had some information coming in on the VEBA program that he would like to show [the

Wilkses]…"  (Id., p. 6).  The Wilkses met a third time with Mr. Callahan in March 2004.  Either

at that time or in the February 2004 meeting, Mark presented the Wilkses with brochures relating

to the VEBA plan.  (Compare Doc. 159-4, J. Wilks Dep., p. 8 with Doc. 176-1, B. Wilks Dep., p.

8(At February meeting, Mark "had brochures and fliers and information about the VEBA

program at that time which he shared with [the Wilkses].")).  G.B. Taylor testified that at the

meeting, "Mark Callahan told everyone that the VEBA Plan was an AIG-developed program"

and that "by enrolling in the VEBA Plan, they would be entitled to tax deductions for the

contributions used to pay premiums… and that the VEBA Plan would provide them lifetime tax

benefits, and tax-free money would be paid to the beneficiaries at the end of a period of time."

Mr. Taylor also testified that "Callahan told everyone present that the VEBA Plan had been

approved by the [IRS]."  (Doc. 183-2, Taylor Aff., ¶ 4).

Billy Wilks testified that besides the discussion about contributions to the plan being tax

deductible, they "talked in general about the VEBA plan" and "one of the things that came up in

that second meeting was that there was a slot… open in this VEBA plan or organization in

California… and we needed to take advantage of that slot being open and get into that

program… there seemed to be an urgency for us to do that." (Doc. 176-1, B. Wilks Dep., p. 9). He also testified that they "talked about insurance would be part of the plan" in that Mr. Callahan "mentioned AIG being the participant in this plan and that they would be the ones furnishing the insurance and that that was part of the plan", specifically "that the plan would have a life insurance policy as part of the total package." (Id., pp. 9-10). Furthermore, "in generalities, [the Wilkses] were told that the contributions we made would go into the VEBA trust and be invested on our behalf and grow to the point that – I recall the five-year sequences" that the Wilkses "would contribute for five years" and "[t]hen there would be a five-year period when it would – [the Wilkses] would not contribute anymore, but it would grow." Then they were told "after the 10-year period, John and Mike could start drawing their retirement, dividend checks from it" and that "Sea Nine Associates… were the administrator of the VEBA trust and that they invested the money, and then the dividends and all would grow from their investment capabilities." (Id., pp. 10-11). Billy further stated that in general "the loan just really was explained to us then. That basically what you were doing was borrowing from your insurance policy." (Id., p. 11). Mark thereafter told the Wilkses "that a group would be coming in from California to--- that a meeting was being set up, and that they would be coming in later to explain in more detail the entire program." (Id., p. 12). Lastly, Mark told the Wilkses that they needed to undergo physical examinations "to get the VEBA moving." (Doc. 159-4, J. Wilks Dep., p. 9).

The health exam application was obtained from AIG. (Doc. 172-1, Lalat Dep., p. 10). The Wilkses took medical exams in or around March 2004. (Doc. 176-1, B. Wilks Dep., p. 13). The medical information, along with financial and other background information on the Wilkses, was gathered through Lalat's office. Lalat testified that it was "impossible" that he could have signed up J&M without AIG knowing about it. (Doc. 172-1, Lalat Dep., pp. 10-11; Doc. 185-2,

pp. 12-17).   One of the medical forms identify the "agent name": as "Lalat Pattanaik" and the "agency name" as "IPS Enterprises."  (Doc. 185-2, p. 19).  The Profile Services form for AIG lists the "Agency" as "IPS Enterprises."  (Doc. 185-2, pp. 23-24).

On April 1, 2004, J&M had a special meeting of the board of directors in which they adopted the VEBA Master Plan and Master Trust presented by John Wilks and directed John "on behalf of this corporation to execute this agreement adopting the Master Plan and Master Trust" and also "to direct Union Bank of California, as trustee under the Master Trust, pursuant to the Master Plan, to acquire life insurance Contracts (as defined in the Master Plan) issued by [AIG]…"  (Doc. 185-2, p. 8-10).   On April 5, 2004, John Wilks signed as president of J&M an adoption agreement "adopt[ing] the California Building Supply Wholesalers' and Contractors' League Voluntary Employees' Beneficiary Association Master Plan and its companion Master Trust" ("Adoption Agreement").  (Doc. 185-2, pp. 2-5).  In the Adoption Agreement, J&M agreed to make "an initial deposit of $1,012,000.00 to the Master Trust" and that the "Benefits to be provided under the [Master] Plan shall be fully funded."  (Id., p. 2).  The Adoption Agreement also provides that J&M is entitled to "[a] life Benefit equal to 12.84 times the Participating Employee's Benefit base shall be provided to each Participating Employee" but that "Other Benefits are not provided by the Plan."  (Doc. 185-2, p. 3).  In regards to the duration of the life benefits, the Adoption Agreement states that

> …the Life Benefit shall consist only of current protection, containing no economic value (such as paid-up or cash surrender value) extending beyond one Plan Year, irrespective of whether the provision of such Benefit is funded by the Trustee pursuant to the Master Plan with term or ordinary life Contracts.  In the latter instance, the Participant shall have no rights in the Contract other than to the death Benefit protection.  Accordingly a Participant shall have no rights in the Contract other than to the death Benefit protection…

(Doc. 185-2, p. 4).

The Adoption Agreement also provides that the "Benefits under the Plan are limited" in that "[a]n Employee's Benefit base shall be such Employee's compensation, with adjustment only as provided in [Master] Plan § 5.03." (Doc. 185-2, p. 3). Lastly, the Adoption Agreement contains the following provision:

> The Participating Employer assumes full responsibility for evaluating the tax consequences of adopting the Plan, and the participating Employer shall hold harmless the Trustee and the Administrative Service Provider from any liability regarding such matters.
>
> (Id., p. 5).

The Master Plan, which was adopted by J&M as stated above, provides that the initial contribution made by J&M, and any other contributions, and any earnings or accruals thereon shall be invested by the Trustee in "Contracts to the extent provided here." (Doc. 159-9, p. 11). A "Contract" is defined as "[a] policy issued by a legal reserve life insurance company, with or without an insurance element." (Id., p. 4). Section 5.01 of the Master Plan states that "the Benefits provided by this Plan are stated in the Adoption Agreement" subject to the limitations of section 5.02 of the Master Plan (Doc. 159-9, p. 12). Section 5.02 provides that "[t]he [Master] Plan may provide only Life and other Benefits." (Id.). The Master Plan defines "Benefits" as "life and other welfare benefits as may be adopted by the Participating Employer pursuant to the Adoption Agreement attached hereto and made part hereof." (Id., p. 3). The Master Plan defines "life benefits" as:

> a Benefit including a burial benefit or a wreath payable by reason of the death of a Participant. A "life benefit" may be provided directly or through insurance. It generally must consist of current protection, but also may include a right to convert to individual coverage on termination of eligibility for coverage through the Plan. A "life benefit" also includes the Benefit provided under any life Insurance Contract purchased directly from the Plan by a Participant.
>
> The "life benefit" may be paid in a form of survivor income Benefit to a named Beneficiary or if no Beneficiary is named, [then] to the estate of the deceased

Participant. Such Benefit may be payable upon the death of the Participant in a series of monthly payments not to exceed 120…

Furthermore, the Master Plan states that "[e]xcept as provided by applicable law, the Insurer [AIG] shall not be deemed to be a party to this Plan and its sole obligations shall be measured and determined solely by the terms of the its Contracts and other agreements executed by it." (Doc. 159-9, p. 17). The Master Plan further provides that "[a]ny Participating Employer shall have the right to terminate its participation in this Plan (as a Voluntary Termination) by delivering written notice of termination to the Committee to be forwarded to the Trustee with properly authorized written directive." (Id., p. 20). It further stated that "[t]o be eligible to terminate such Participating Employer's participation in the Plan, one of the following events must have been encountered by such Participating Employer: (a) Adverse business conditions…." (Id.).

Also on April 5, 2004, John Wilks signed a document entitled "Disclosure of Method of Benefits Under the Proplan VEBA Welfare Benefit Trust." In that document, he and J&M "acknowledge that it has been disclosed that all of the obligations under the plan will be applied for and provided by insurance and or annuity policies issued by legal reserve insurance companies." They also "understand and agree fully that benefits thereby provided, will be governed solely by and limited to the provisions contained in the insurance policies." In other words, the "[p]olicies may be converted upon employee withdrawal due to hardship if the minimum funding period has been met." They also "acknowledge that the beneficiary of the policy(ies) will be the Plan Trustee" and that "[t]he beneficiary of the Employee properly represented by the Employer has been nominated by the member participants through separate beneficiary nomination forms." Lastly, they note that "since this plan having been adopted by the Employer provides only death benefits, the plan may not be used by the employer for

purposes of deferred compensation and/or for other purposes including, but not limited to buy-sell agreements."  (Doc. 159-7, p. 2).

John Wilks testified that all the above documents were in their possession at their office, that they had an opportunity to read all of these documents, and that they had the opportunity to "get any sort of assistance [he] deemed necessary with respect to understanding them before [he] signed them."  (Doc. 159-3, J. Wilks Dep., pp. 25-26).

On or around May 17, 2004, the Wilkses, Shane Switzer, Justin Taylor, G.B. Taylor, and others met with Lalat and Mark Callahan at the Grand Hotel in Point Clear, Alabama ("Grand Hotel meeting").  (Doc. 159-4, J. Wilks Dep., pp. 10-11).  At that meeting, Lalat and Mark presented to the Wilkses and other potential clients various aspects of the VEBA plan, including providing them a due diligence package.  (Id.; Doc. 159-3, J. Wilks Dep., p. 11; Doc. 174-1, Callahan Dep., p. 8).  The due diligence package contained nine sections: (1) two VEBA articles from accounting journals; (2) a package submitted to AIG for review and approval, including a copy of one of the nine master trusts that IPS has; (3) a copy of each of the 9 IRS Letters of Determination; (4) a technical memo by an employee benefits/ERISA consulting firm; (5) three "sample" individual "More Likely than Not" legal opinions obtained by three separate clients; (6) ten separate legal opinions on the Southern California Trusts over the last 17 years covering a range of topics including deductibility; (7) documentation from all three major IRS audits in 1994, 1996 through 1998, and 1998 through 1999; (8) other code sections, revenue rulings, PLR's, general counsel memorandum, case law, etc.; and (9) information regarding insurance company/product used/legal opinion on the product.  (Doc. 159-6, p. 3).  Under the table of contents, the package provided the following disclaimer:

> This material is designed to provide accurate and authoritative information with regards to the subject matter covered.  It is prepared with the understanding that

IPS is not engaged in rendering legal, accounting, or other professional services. If legal or other assistance is required, the service of a competent professional should be sought.

(Doc. 159-6, p. 3).

The package specifically contained a letter from the Reish law firm dated December 20, 2002 , which addressed a variety of issues relating to the VM5 policy. (See Doc. 183-3). In part, the Reish law firm letter states that if a policy holder intends to purchase the VM5 policy in the fifth year, "they do so at using the reserve value rather than the cash surrender value" which would comply with IRS statements in Notice 89-25. (Doc. 183-3, p. 13). The package, however, did not contain the January 27, 2004, letter from Reisch to Elliott, which relayed Reish's concerns about the VEBA plan in light of the final 419 regulations, and it did not contain a copy of the final 419 regulations which were issued in July 2003. (Doc. 172-1, Lalat Dep., p. 10; Doc. 173-1, Lalat Dep., pp. 33 & pp. 38-39). When asked why these materials were not included in the package, Lalat testified that "it was purely an operational issue, because these packages – probably 10 of these books were already made before year-end, and that's why." (Doc. 173-1, Lalat Dep., p. 33).

Also included with the due diligence package was the IPS VEBA brochure and a technical guide provided by AIG specifically designed for advisors. (Id.). One of the documents provided to the Wilkses stated that the plan's assets would belong to the VEBA Trust and that those assets would be used to purchase the life insurance policies. (Doc. 159-2, p. 11). That document also states that "[t]he assets (including cash, insurance, annuities) do not belong to any sponsoring business or any of the participating employee/owner until a triggering event such as death or plan termination causes benefits to be paid or assets to be distributed to them." (Id.).

Billy Wilks testified that at the meeting, there were "AIG banners… all over the room." Billy also testified that Lalat "basically told us his experience, more or less qualified his

existence."  After this, he "got into the program, the nuts and bolts of the program and how it worked, and that the investment was secure.  It was tax exempt.  It would earn money and at some point you could go in and start taking the money out tax free."  He also stated that "the program was flexible.  It was designed to pretty well accommodate anyone that wanted to participate in it.  Contributions could – were flexible.  Obviously, the amount that you put in determined how much you could take out later."  Billy recalled a particular instance when "Shane Switzer, our CPA, ask[ed] the specific question if my client, J&M, participates and a year or a year and a half into the program, they find they can't make contributions, what happens" and that "Lalat's response was no problem.  It's very flexible.  You can reduce your contributions, even stop them for a while, because there's a hardship rider in the program." (Doc. 176-1, Wilks Dep., pp. 14-15; see also Doc. 185-2, p. 1).[4]

---

[4] G.B. Taylor, who was also in attendance at this meeting, testified as to the following facts:

> At this presentation, Lalat Pattanaik told everyone that the VEBA Plan was approved by AIG.  The presentation involved illustrations and written materials and discussing the advantages of enrolling and participating in the VEBA Plan. Lalat Pattanaik told everyone that, by enrolling in the VEBA Plan, they would receive lifetime tax-exempt benefits, tax-free money to be paid to the beneficiaries after a period of ten years, the Plan had no minimum or maximum funding requirements and that the insurance products would be distributed to the participants at the end of a period of time at a substantially-reduced surrender value; and the policies would be converted to variable life insurance policies at a substantially-increased value at a later time.  He told everyone that the AIG insurance policies, which would fund the VEBA Plan, were suitable for this purpose and had been developed by AIG for the purpose of funding the VEBA Plan.

> Lalat Pattanaik told everyone that the VEBA Plan was an excellent way to purchase life insurance in a program designed as a tax shelter, which offered tax-free withdrawals as deferred compensation plus permanent life insurance.  Lalat Pattanaik told everyone present that they would be entitled to current income tax deductions for all contributions they paid into the VEBA Plan and that it was not a Listed and Reported Transaction since the Plan had been approved by the IRS.

(Continued)

Also at this meeting, a pamphlet dated February 8, 2004, and titled "Presentation to J&M Associates, Inc.", part of which was prepared using AIG software, was given to the Wilkses. (Doc. 173-1, Lalat Dep., pp. 21-22). This illustration was provided to the Wilkses which showed that the Wilkses would make a total contribution of $5,058,600 in the first five years, an amount which would result in $2,023,200 "[t]ax savings based on contribution." In the sixth year, the illustration provides that John and Mike would "buy out" the policies for $498,938 and that they would have no taxes in the sixth year which would result in a total cost of $3,533,738. They

----

Lalat Pattanaik also told everyone at the meeting that the insurance policies to be issued later contained a hardship rider, which would provide flexibility in the amount of premiums to be paid when it was invoked, and the participants would be permitted to restructure payments by suspending or reducing payments if the participants suffered any kind of economic hardship; and that this would continue until the participants could resume payments at a level to be afforded under the circumstances or could terminate the VEBA Plan with all benefits being distributed to the employees…

I recall that Harvey Morris asked Lalat Pattanaik how much money would be left to participants at the end of the year, if he participated. Pattanaik told Harvey Morris that the money was always safe, and that he could not lose money in this program. Woody Ramsay asked Mr. Pattanaik what would happen if he could not make payments in the future for some unknown reason. Pattanaik told Mr. Ramsay that, if he could not make payments in the future, he would be able to stop making them; and he would remain in the VEBA Plan at the level of his contributions, and that he would never lose the money he had already contributed into the VEBA Plan. Lalat Pattanaik told Woody Ramsay that the program was developed by AIG, and it was guaranteed that he would not lose any money he paid into the Plan.

(Doc. 183-2, Taylor Aff., pp. 10-15, ¶¶ 5-7).

Mr. Lyman Woodside Ramsay, who is the owner and president of Gulf Equipment Company and who was also in attendance at the meeting, testified similarly. (See Doc. 183-2, Ramsay Aff., pp. 16-18, ¶¶ 2-4). Mr. Callahan also stated it was his "understanding and interpretation" that Lalat had told the people at the meeting that the IRS had approved J&M's specific plan. (Doc. 174-1, Callahan Dep., p. 10). Billy confirmed that the plan "was presented to us as a legal IRS exempt, approved retirement plan. That's basically what we understood when we came out of the meeting." (Doc. 176-1, B. Wilks Dep., p. 17).

would then in turn receive $19,772,321 in "[p]ost-retirement benefits" and $6,098,213 in "Death Benefit Assets (after disbursements)" for a "total tax free benefits" in the amount of $25,870,534.  (Doc. 186-1, p. 10).

After the meeting at the Grand Hotel, the Wilkses with Shane Switzer, who is their CPA, met privately with Lalat, Brady Richardson, and Mark Callahan "just more or less repeating the same questions, getting the same answers, and verifying that – what we could do."  (Doc. 176-1, B. Wilks, p. 18-19).  John Wilks testified that thereafter he did some "searches on the computer" but he "found it, you know, to be somewhat burdensome… to try and figure out what I was reading and comparing to what we heard at the hotel."  He stated that he "relied essentially on what was said at the meeting and the information that was handed out to us."  (Doc. 159-4, J. Wilks Dep., p. 14).  He further testified that these internet searches did not cause him to not want to participate in the VEBA Plan.  (Id., p. 15).

In June 2004, the Wilkses met with Michael Mangawang for the first time, Mark Callahan, Brady Richardson and Shane Switzer at Mr. Switzer's office in Pascagoula, Mississippi, to discuss J&M's participation in the VEBA Plan.  (Doc. 159-4, J. Wilks Dep., p. 13; Doc. 174-1, Callahan Dep., p. 4).  Billy Wilks testified that Mr. Callahan had called him and "said that they had another expert that they wanted to send in to meet with us again and more or less make us feel more comfortable about the program" and that person went "by the name of Mangawang."  (Doc. 176-1, B. Wilks Dep., p. 20).  He stated that "we went over more or less a repeat performance of the presentation and the tax exempt and the flexibility and the legality and what a great program it was" and Mangawang "just more or less substantiated what had been told us already to an extent."  (Id., p. 21).  At this point, the Wilkses had already completed the applications for the life insurance but had not yet paid any money.  (Id.).

On June 21, 2004, J&M made an initial payment of $400,000 to "Union Bank of CA FBO J&M Assoc. Inc. VEBA" by express mail to Lalat. (Doc. 187-2, p. 9-10). J&M then paid $10,000 to an attorney in California named Fredrick A. Romero to draft a legal opinion regarding whether J&M's deductions relating to the VEBA Plan would comply with the Internal Revenue Code. (Doc. 159-4, J. Wilks Dep., pp. 27-28). On August 14, 2004, Mr. Romero provided a legal opinion stating in part that "[i]f the IRS should challenge the deductibility of contributions made by J&M Associates, Inc. to the VEBA program, for the benefit of eligible employees, it is more likely than not, that J&M would prevail on the following issues: 1. The VEBA program, is one that is a program described under IRC 501(c)(9) and IRC 419A(f)(6) and 2. J&M Associates, Inc. is entitled to a current deduction for its entire contribution into the VEBA program." (Doc. 187-3, p. 1). Mr. Romero stated that "[b]y the term 'more likely than not' we mean that there is a greater than 50% likelihood that the employer's position would be upheld by the Courts if challenged by the Internal Revenue Service." (Id., p. 2).[5] Mr. Romero further stated that he reviewed the following documents "in connection with our review of the deduction rule applications in formalizing our opinion under substantial authority:

    1) The Plan documents which include the Adoption Agreements and the Plan and Trust Agreements

    2) Various notices to employees concerning eligibility, participation, and benefits;

---

[5] Rather than using the "more likely than not" language in this letter, Mr. Romero stated in an earlier draft that:

> The inclusion of a position in this letter is not conclusive as to whether or not substantial authority exists with respect to the taxpayers position. If however, there is litigation or audits as to whether there is substantial authority, and if a court subsequently decides in favor of the IRS holding that there is no substantial authority for the position, then the relevant penalty would apply.

(Doc. 188-2, p. 2).

3) Copy of Committee and Administrator appointment and duties;

4) Insurance Policies;

5) Illustration provided to J&M Associates pursuant to its adoption of the VEBA;

6) IRS letters of determination; and

7) Opinion Letter dated June 4, 2004 from Reish, Luftman, Reicher & Cohen

(Doc. 187-3, p. 16-17).

In the June 4, 2004, opinion letter, Bruce L. Ashton was "asked [by Ken Elliott]… to comment on whether the several Voluntary Employees' Beneficiary Associations… administered by Sea Nine…. comply with the requirements of Treasure Regulation Section 1.419A(f)(6)-1 issued under Internal Revenue Code… section 419A… The final regulations were issued on July 17, 2003." He stated that his "views expressed in this letter are based on a review of the final Regulations and on the Documents in the form provided to you in draft (with certain changes we have discussed)." He concluded that "[a]ssuming the VEBAs are operated in a manner consistent with the draft documents, which you have confirmed to me you intend to do, I believe it is more likely than not that the VEBAs would be viewed by the IRS as complying with the requirements of the Regulations." (Doc. 187-4, p. 1). He also maintained that he "believed it is unlikely that the VEBAs would be considered 'listed transactions' so long as they are operated in a manner consistent with the Documents." (Id., p. 6). When asked whether the "more likely than not" language was "an acceptable level of risk for J&M, John Wilks testified that "Yeah. Yes, it was." (Doc. 159-3, pp. 28-29).

On August 5, 2004, and August 20, 2004, respectively, AIG issued policies insuring the lives of Johnny and Mike Wilks, pursuant to the applications signed by the Wilks brothers. (Doc. 159-11 & 159-12). A document entitled "Policy Assembly Instruction Sheet" for Johnny Wilks and Mike Wilks lists the "Agency/Agent No." as "B0293SH/KEN ELLIOTT" and the

mailing address as "IPS-Tracey Roberts."  (Doc. 187-2, pp. 3 & 5).  Another document entitled

"AGENT CARD", which also has AIG's name on the top and bottom of the document, lists the

"insured" as Johnny Wilks, the agency as Innovative, and agents as Laban and Ken Elliott.

(Doc. 187-2, p. 6).  On August 23, 2004, J&M sent a check for $300,000 to "Union Bank of CA

FBO J&M Assoc. Inc. VEBA" via Lalat.  (Doc. 187-2, pp. 11-12).   On September 28, 2004,

AIG issued a policy insuring the life of Billy Wilks, pursuant to the application signed by Billy.

(Doc. 159-13).  In September 2004, the Wilks received copies of the policies.  (Doc. 159-14;

Doc. 176-1, B. Wilks Dep., p. 22).

John and Mike Wilks' policies identify the owner of the policy as "Union Bank of CA",

the product name as "Platinum VM 5+" and also references a "Hardship" rider.  (Doc. 187-1, p.

5; Doc. 159-11, p. 32).  The policy also states that the "Exchange Option" does not apply

because the policy was issued to a "Qualified Plan", but if the policy is "sold or distributed from

the Plan", the Exchange Option becomes available on the first day of the tenth policy year.

(Doc. 187-1, p. 3).  The hardship rider states that "the Owner may apply for an exchange in the

event of Substantial Business Hardship."  (Doc. 159-16, p. 2).  In determining "Substantial

Business Hardship,"  the rider states that "the Company shall base its determination of

Substantial Business Hardship on a number of factors including, but not limited to:

> (1) The Owner's business which is being operated at an economic loss (or the business of the employer sponsoring the Qualified Plan if the Owner is a Trustee);
>
> (2) The level of sales and net profits or losses;
>
> (3) The reasonable expectation that premium payments can be continued only if the exchange is granted.
>
> (Id.).

To become eligible for a hardship exchange under the rider, "the Owner must furnish evidence

satisfactorily to the Company that:

(1) The Owner is unable to make premium payments without a Substantial Business Hardship; and

(2) The failure to make premium payments would be adverse to the interests of the Owner.

(Id., p. 3).

On December 24, 2004, J&M sent another payment of allegedly $400,000 by express mail to Lalat. (Doc. 187-2, p. 12-13).[6]  In the fall of 2005, J&M began to experience a decline in cash flow due to Hurricane Katrina and was anticipating a problem making contributions. (Doc. 176-1, B. Wilks Dep., p. 24).  Billy Wilks testified that he "discussed that with Mark.  And Mark said, well, let me get Lalat to call you.  And Lalat did."  When Lalat called Billy's office, Billy testified that "we put it on a speaker phone.  John, Mike, and myself were there.  I don't recall if Mark was on the conference call or not… we did have a conversation with Lalat, and we told him about our potential problems."  (Id.).  Specifically, they "asked… about the hardship rider that we had been told was part of the plan.  And Lalat said, well, we're not near to a point that we need to kick in the hardship rider.  Don't worry about that.  And that was his statement on that particular question."  (Id., pp. 24-25).  Billy also recalled Mike Wilks asking Lalat "on that phone conversation… what about the million dollars that we have in the plan right now, what is the status of it, because we don't have any reckoning of that.  We don't have any reports."  Billy stated Lalat responded that the "million dollars is fine.  It's in the system.  It's earning money as we speak.  Don't worry about your million dollars.  It's there.  It will always be there.  That was his statements."  (Id., p. 25).  Billy further testified that when they expressed their concerns that they "may not be able to put a million dollars in for '05", Lalat asked "how

---

[6] On September 11, 2004, John Wilks signed a policy illustration that was prepared by AIG.  (Doc. 159-15, p. 8).  On that same date, John and Mike Wilks signed a policy illustration prepared by IPS.  (Doc. 189-1, pp. 1-6).

much can you put" and they responded "maybe a third of that or half of it" and that they "weren't sure because we had outstanding invoices that hadn't been paid." (Id., p. 25-26). Lalat then told them that he was "coming into Mobile, Alabama in a week or two and asked if they could meet." (Id., p. 26).

On October 3, 2005, Lalat wrote an email to Tracey Roberts at IPS that stated:

We need to help our boys at J&M associates get back on track, they have had a severe setback due to a combination of things including the recent Hurricane – with damage to part of their operations and destruction of their offices…

I need to know:

what relief – AIG is providing storm relief afflicted clients.

I am particularly concerned since [] Mike and John have premiums due i[n] the $450K range and can only pay partially until they get back on tract [sic] at year end. What is the best deal that we can work out for them.

Please see what premiums are due, what time relief we can get for them without any payment, what are our options to temporarily convert them to quarterly till the first quarter of 2006 and then what payment plan can we set up for them up with to give them as much time as we can possibley [sic] provide within reason to allow them to get their stuff back in order over th[e] next 3-6 months.

… and before this goes to anyone – please discuss with Peter [Mordin].

(Doc. 189-4, pp. 4-5).

Tracey shortly thereafter forwarded Lalat's message to Peter Mordin, stating "[l]et me know if there is anything we can do about their premiums." (Id., p. 4). Peter then forwarded the email to Mark McGuire who is the Senior Vice President of Insurance Services, and the email was then forwarded to several other employees at AIG. (Id., pp. 2-4). Cheri Bourgeois, who is Manager of Customer Care Services/Agent Call Team, ultimately responded to Lalat, Peter Mordin, and others on October 5, 2005, stating that:

On 9/19, Di with Union Bank contacted me on the [the Wilkses' policies]. The first 30 day extension has been granted – extension currently until 11/5. At that

time both of these policies were suspended in our system for nothing would happen to them…

(Id., p. 1).

Lalat responded by email that he "will be visiting the Wilks in the South in a couple of weeks to evaluate how badly they were impacted and help them make arrangements to get back on track to their original funding levels as soon as they can – hopefully by year end or by January." (Id.).

Shortly thereafter, Lalat, Mark Callahan, and the Wilkses met at a coffee shop in Fairhope, Alabama. (Id., p. 27). Billy testified that Lalat and Mark reassured them "that it was not time to invoke the hardship rider" and "that the contributions we made were safe, secure, earning us money" and testified that Lalat and Mark stated "[l]et's just talk about what you can do, not what you can't do, and so forth and so on. So it was just a rehash of the telephone conversation." Billy stated that "the decision was made then that we could at some short-term future date make some more contributions in '05, which we did." (Id., pp. 27-28). On October 31, 2005, Lalat sent an email to Peter Mordin, Cheri Bourgeois, and others stating that he had met with the clients and "[t]hey are still under financial stress as a result of the couple of events that they described in their letter and which I have conveyed to you." He further stated that the Wilkses "are attempting to catch up in the middle of December with a contribution amount that would carry them till Feb and then they will move forward as planned from that point onwards. **So at this point in time, we need to buy time till December 5th.**" He maintained that he "will contact them in mid November to see if they can make the balance of the contribution by end of November to bring them up to date. If they cannot, we may have to do this one more time and they have committed that they will get me the needed contribution by Mid December." (Doc. 189-4, p. 6). J&M made two more contributions of $110,00 and $150,000 in September and December 2005, respectively. (Id., p. 23).

J&M took deductions on its tax returns for its VEBA Plan contributions in 2004 and

2005. (Doc. 159-20, Switzer Dep., pp. 4). Shane Switzer, as J&M's certified public accountant,

prepared J&M's tax return documents and John Wilks signed the documents. (Doc. 159-4, J.

Wilks Dep., p. 23). J&M relied on Mr. Switzer as its CPA to advise the Wilkses with respect to

their decision to participate in the VEBA. (Doc. 159-3, p. 13). In February 2006, Mark Callahan

came to J&M's office and talked to Billy Wilks. Billy testified that:

> Mark appears in my office one morning and in kind of a state of confusion and
> shock, looked like to me. His eyes were dilated almost, and he was talking
> incoherent. I had never seen him like that before. And I said, what's the problem.
> And he said we're all in big tax problem trouble. If you all don't catch your
> contributions up, you're going to be hit with income tax on all this money, the
> million dollars you have put in.
>
> And I said, well, you know, why is this all of a sudden a problem. It wasn't a
> problem a month ago. Well, it's just – that's just the way the IR – the thing is. If
> you all get out of the program or it's terminated or your policies lapse, then you're
> going to have an IRS problem. You're going to have to pay all these back taxes
> and everything.
>
> And I said, well, that's not what we were told. That's not how the program was
> presented to us. That's not what you and Lalat told us at the coffee shop meeting.
> It's not what you said when we made the last payment and so forth.
>
> But he was – he even got to the point, he said, can't you borrow a million dollars
> to put in this VEBA program. I said, well, it's not a question of whether I can or
> not. I'm not. You now, I'm not going to borrow money to put in the program.
>
> (Doc. 176-1, B. Wilks Dep., pp. 29-30).

Billy stated that "this is when things started to unravel, and that's when I tried to get in touch

with Lalat and others, because I had lost a little confidence in Mark after that meeting." (Id., p.

30).

Mike had thereafter attempted to contact Lalat, and Lalat wrote an email to Mike, John

and others stating that:

> I want you to remember that we work for you – our clients and will do what we
> can to make sure that there is whatever amount of damage control possible.

Having said that, we have never had a client this early in the plan's life need to make an amendment.

With regards to what was told and what was not – a lot transpired over that period of time – including multiple parties, phone calls and conversations. The reason that back payments were not discussed was because it applies to such a very specific set of facts – that it is not the normal course of discussion in an insurance sales process. Obviously having a natural disaster and other things go astray all at once are also not normal; consequently the outcome and potential solutions may be something "not normal" as well.

It is common in insurance to make back payments to catch up with skipped payments; but the catch is that you would have to do all the meds and so forth ("reinstatement" of the policy). The positive outcome is that by making such back payments in the future – you preserve the value of what you already have contributed and simply fulfill the obligation at a future date for what your commitment was.

I will get the answers to you about restructuring the polices (it will literally take me a couple of days) as we have NEVER done this – particularly this early in the plan's life…

Please note, one of the VEBA rules about a reversion to the employer (J&M) is that it would cause a 100% penalty tax since you contributed and expensed that contribution as a deductible item for welfare benefits. Consequently we want to avoid that at all costs.

(Doc. 189-1, p. 9).

In September 2006, John, Mike, and Billy Wilks talked to Ann Henderson at AIG regarding their "situation and Lalat Pattanaik's name and our concern, but bottom line, Mrs. Henderson was somewhat in the dark about the situation, didn't seem to ring a bell with her when Mr. Pattanaik's name was mentioned, nor our concern." (Doc. 159-3, J. Wilks Dep., p. 31). On October 11, 2006, Ms. Henderson sent a letter to John Wilks as a "follow up to previous correspondence regarding your concerns about" the policies. (Doc. 159-21). The letter provided that:

The Company has reviewed the concerns you have expressed regarding these policies, where were purchased as the funding vehicle for the Voluntary Employee Beneficiary Association (VEBA). Please note that the Company is not the plan provider and our involvement is limited to the role of that of the issuing

life insurance company for the policies.  Furthermore, these policies are owned by California Building Supply Wholesalers' and Contractors' League VEBA Welfare Benefit Plan and Trust ("the "VEBA Plan").  As such, any requests for policy changes must come from the owner.  In the interest of providing information responding to the complaint you filed with both the Mississippi Department of Insurance and with the Company, we are responding to you directly with a copy to the Trust.  Generally speaking, the Company communicates solely with the owner of contracts issued by it.

You need to understand that because you are not the owner of the policies any concerns regarding the VEBA Plan including questions concerning restructuring of the Plan itself and questions concerning the amount of funding required for the plan should be directed to the administrator and/or trustee of the VEBA Plan, Union Bank of California.  Any restructuring of the said plan must be approved by the administrator and the Trustee.

…The Company understands that you can no longer afford the premiums on these policies and are therefore requesting that the policies be reconstructed in order to lower the premiums necessary to continue the policy.  [The Policy] does include a Business Hardship Rider.  The rider enables the Owner to apply for an exchange in the event of substantial Business Hardship.  Exercise of the rights under this rider may require amendment, or termination, of the qualified plan…

In order for the Company to exercise this rider, the Company will require a written request signed by the owner along with evidence that your business has experienced a hardship and is unable to make premium payments without a substantial business hardship or that the failure to make premium payments would be adverse to the interests of the Owner.

The Company has enclosed several projections illustrating exchanges of the policies through exercise of the rider.  These illustrations reduce the face amount of coverage ultimately resulting in a decreased premium.   The Company encourages you to discuss these options, as well as your needs, with the Administrator to determine how they may affect the VEBA Plan.  You may wish to consider seeking the advice of a qualified professional who can advise you of any tax consequences that you may experience….

At the present time, premiums are due… and if not paid the policy will terminate without value and will no longer provide any life insurance coverage.  The plan trustee and administrator need to advise the Company within two weeks from the date of this letter, by October 25, 2006, if they will exercise the business hardship rider and which policies they intend to select for the exchange…

(Doc. 159-21, pp. 2-4).

AIG did not receive any written request from the owner of the policies requesting to exercise the hardship rider.  (Doc. 159-22, Henderson Dep., p. 3).  On November 2, 2006, Ms. Henderson sent a follow-up letter to John Wilks regarding the same issue described above, and again, AIG received no response.  (Docs. 159-23 & 159-24).

At some point thereafter, the IRS assessed 6707A penalties in the amount of $400,000 against J&M for its failure to disclose on a Form 8886 its participation in a listed transaction.  (See Doc. 159-3, J. Wilks Dep., p. 42; Doc. 72).  J&M's expert explains that "[t]he phrase listed reportable transactions first came out February 28, 2000", that these transactions are listed on a Notice 2001-51 and are considered "abusive tax shelters or tax avoidance transactions", and that "anyone who is participating in any of the listed transaction or anything that is the same or substantially similar to… those transactions listed are required to report" that transaction on a "Form 8886."  (Doc. 180-2, Bass Dep., pp. 3-4, 7).  If one participates or a taxpayer participated in a listed transaction and they file the Form 8886, then they would not be subject to the 6707A penalties.  (Id., p. 4).  However, even if a person reports said transaction, the IRS may still not allow the deduction claimed on his or her tax return.  (Id.).  Listed in the Notice 2001-51 is Notice 95-34.  "Notice 95-34, which was published in 1995, identified certain trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits – that's contribution limits – of Section 419 and 419A of the Internal Revenue Code."  Thus, "any plan that is claiming an exemption under 419A(f)(6) would be the same as or substantially similar to those identified by the Service as abusive tax shelters and listed and reportable transactions."  (Id., pp. 7-8).  Notice 95-34 identifies four characteristics of plans that do not qualify for the exemption under 419(f)(6): (1) "ones that provide deferred compensation"; (2) "are considered separate plans for each employer"; (3) "are experience rated"; and (4) "represent prepaid

expenses." (Id., pp. 8-9). Mr. Bass, and it appears the IRS as well, concluded that the VEBA Plan "incorporated elements from all of these". (Id.., pp. 9).

AIG alleges that as of September 27, 2009, the policies insuring John and Mike Wilks are active but in a reduced paid-up status. In other words, "[p]ursuant to the policies provisions, the available cash value was used to purchase a fixed amount of death benefit." AIG further alleges that the policy insuring Bill Wilks is still active. Lastly, AIG states that the "[p]olicies are still owned by the VEBA Plan." (Doc. 160, p. 9)(citing Docs. 159-25, 159-26, 159-27).

## LEGAL ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  See Anderson, 477 U.S. at 251-252.

The moving party bears the burden of proving that no genuine issue of material fact exists.

O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of

the moving party, the court must view all evidence in the light most favorable to the non-moving

party, and resolve all reasonable doubts about the facts in its favor.  Burton v. City of Belle

Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).   "If reasonable minds could differ on the

inferences arising from undisputed facts, then a court should deny summary judgment."  Miranda

v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank

& Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

     Once the movant satisfies his initial burden under Rule 56(c), the non-moving party

"must make a sufficient showing to establish the existence of each essential element to that

party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil

Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material

issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604,

608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in

[the non-moving party's] pleading; rather, its response .... must – by affidavits or as otherwise

provided in this rule – set out specific facts showing a genuine issue for trial."  FED. R. CIV. P.

56(e).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for that party."

Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving

party may avail itself of all facts and justifiable inferences in the record taken as a whole."

Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

## II. Breach of Contract

In Count One of the complaint, J&M alleges, in part, that "AIG breached it's agreement with J&M… by failing to provide suitable insurance policies as promised, and by failing to provide the insurance benefits agreed upon, among other things."  (Doc. 1, ¶ 30).  AIG asks for summary judgment because "AIG's "sole obligations were limited to providing insurance on the lives of its insureds…"  (Doc. 160, pp. 14-15; Doc. 192, pp. 17-18).  This court finds AIG's argument persuasive.

In the present case, there are two groups of written contracts: (1) the Master Plan and the Adoption Agreement and (2) the insurance policies.  In the Adoption Agreement, J&M agreed to make "an initial deposit of $1,012,000.00 to the Master Trust" and that the "Benefits to be provided under the [Master] Plan shall be fully funded." (Doc. 185-2, p. 2).  On June 21, 2004, J&M made an initial payment of $400,000 to "Union Bank of CA FBO J&M Assoc. Inc. VEBA" by express mail to Lalat.  (Doc. 187-2, p. 9-10).  On August 23, 2004, J&M sent a check for $300,000 to "Union Bank of CA FBO J&M Assoc. Inc. VEBA" via Lalat.  (Doc. 187-2, pp. 11-12).  On December 24, 2004, J&M sent another payment of approximately $400,000 by express mail to Lalat.  (Doc. 187-2, p. 12-13).  By the end of 2004, J&M had satisfied the initial deposit requirement as stated in the Adoption Agreement.

Upon receiving these funds, the Trustee fulfilled his obligation under the Master Plan and Adoption Agreement to purchase life insurance for the Wilkses,[7] and J&M received the benefits as provided by the Master Plan and the Adoption Agreement. Section 5.01 of the Master Plan states that "the Benefits provided by this Plan are stated in the Adoption Agreement" subject to the limitations of section 5.02 of the Master Plan (Doc. 159-9, p. 12). Section 5.02 provides that "[t]he [Master] Plan may provide only Life and other Benefits." (Id.). The Master Plan defines "Benefits" as "life and other welfare benefits as may be adopted by the Participating Employer pursuant to the Adoption Agreement attached hereto and made a part hereof." (Id., p. 3). The Master Plan defines "life benefits" as:

> a Benefit including a burial benefit or a wreath payable by reason of death of a Participant. A "life benefit" may be provided directly or through insurance. It generally must consist of current protection, but also may include a right to convert to individual coverage on termination of eligibility for coverage through the Plan. A "life benefit" also includes the Benefit provided under any life Insurance Contract purchased directly from the Plan by a Participant.
>
> The "life benefit" may be paid in a form of survivor income Benefit to a named Beneficiary or if no Beneficiary is named, then to the estate of the deceased Participant. Such Benefit may be payable upon the death of the Participant in a series of monthly payments not to exceed 120…
>
> (Id., p. 12).

The Adoption Agreement provides that J&M is entitled to "[a] life Benefit equal to 12.84 times the Participating Employee's Benefit base shall be provided to each Participating Employee" but that "Other Benefits are not provided by the Plan." (Doc. 185-2, p. 3). In regards to the duration of the life benefits, the Adoption Agreement states that

---

[7] The Master Plan provides that this contribution, any other contributions, and any earnings or accruals thereon shall be invested by the Trustee in "Contracts to the extent provided here." (Doc. 159-9, p. 11). A "Contract" is defined as "[a] policy issued by a legal reserve life insurance company, with or without an insurance element." (Id., p. 4).

> …the Life Benefit shall consist only of current protection, containing no economic value (such as paid-up or cash surrender value) extending beyond one Plan Year, irrespective of whether the provision of such Benefit is funded by the Trustee pursuant to the Master Plan with term or ordinary life Contracts. In the latter instance, the Participant shall have no rights in the Contract other than to the death Benefit protection. Accordingly a Participant shall have no rights in the Contract other than to the death Benefit protection…

(Doc. 185-2, p. 4).

The Adoption Agreement also provides that the "Benefits under the Plan are limited" in that "[a]n Employee's Benefit base shall be such Employee's compensation, with adjustment only as provided in [Master] Plan § 5.03." (Doc. 185-2, p. 3).

In accordance with the express terms of the Adoption Agreement and the Master Plan, the Trustee requested and AIG issued a modified whole life insurance policy on all three of the Wilkses, policies which provided proceeds to the Wilkses' beneficiaries in the event of their death. (See Doc. 159-11, p. 2).[8] All three of the policies require the owner of the policy to pay AIG a specific amount annually as premium payments for the policy and these annual payments shall continue till either the insured dies or the insured reaches a hundred-years-old. The insurance policy also provides that AIG shall pay "death benefit proceeds" to the beneficiary of the insured "if the insured dies prior to the Maturity Date and while this policy is in force" or will pay the "cash surrender value" of the insurance policy to the owner of the policy on the maturity date "if the Insured is living on that date." (See Doc. 159-11, p. 2-4).[9]

---

[8] On August 5, 2004, and August 20, 2004, respectively, AIG issued policies insuring the lives of Johnny and Mike Wilks, pursuant to the applications signed by the Wilks brothers. (Doc. 159-11 & 159-12). On September 28, 2004, AIG issued a policy insuring the life of Billy Wilks, pursuant to the application signed by Billy. (Doc. 159-13).

[9] For example, the Trustee, who was the owner of the policy, is contracted to pay $448,818.33 in annual premium payments on behalf of John Wilks for a maximum of 61 years, a date which is when the life insurance policy matures.

In light of the foregoing, this court finds that the undisputed evidence shows that AIG did

not breach any of the express terms of the Master Plan, Adoption Agreement, or the insurance

policies.  J&M, however, argues that the above contract also "consists of the promises made by

AIG's agents in presentations, in the written documents and AIG-generated illustrations."  (Doc.

170, p. 26; <u>see</u> <u>also</u> Doc. 197, pp. 3-4).  This court disagrees.  In Alabama, "[t]he general rule of

contract law provides that if a written contract exists, the rights of the parties are controlled by

that contract and parol evidence is not admissible to contradict, vary, add to, or subtract from its

terms." <u>Marriott Intern., Inc. v. deCelle</u>, 722 So.2d 760, 762 (Ala. 1998)(citing <u>Clark v.</u>

<u>Albertville Nursing Home, Inc.</u>, 545 So.2d 9, 11 (Ala. 1989).   However, if the contract is

ambiguous, parol or extrinsic evidence will be allowed to clarify the contract.  <u>Id.(citing</u>

<u>Cummings v. Hill</u>, 518 So.2d 1246, 1247 (Ala. 1987).  The Master Plan, Adoption Agreement,

and insurance policies are unambiguous as to the rights of the parties.  The  Master Plan and

Adoption Agreement expressly provide that J&M will send money to the Master Trust and that

the Master Trust will, in turn, purchase and then fund a life insurance policy for John Wilks,

Mike Wilks, Billy Wilks, and any other participating employee.   In the present case, the Trustee

received the funds and AIG issued three separate policies insuring the lives of John, Mike, and

Billy.  The written policies unambiguously state that the Master Trust must pay a specified

amount per year till each participant reaches 100 or dies, and upon those milestones, the policies

provide benefits to the beneficiaries of John, Mike, and Billy.  Since the alleged promises made

by AIG's alleged agents in presentations, in the written documents, and AIG-generated

illustrations would contradict, vary, add to, or subtract from the terms of the Adoption

Agreement, Master Plan, and insurance policy, this parol evidence is not admissible as to the

breach of contract claim.  In sum, this court concludes AIG did not breach the contract by

allegedly failing to provide suitable insurance policies as promised or by failing to provide the insurance benefits agreed upon since both the Trustee and AIG provided exactly what was contracted for in the Master Plan, Adoption Agreement, and the insurance policies.

In addition to the above claim, J&M also alleges in Count One of the complaint that "AIG breached it's (sic) agreement with J&M by failing to restructure said policy under the VEBA Plan and/or by failing to invoke the hardship rider as promised when J&M requested such relief breached the contract…" (Doc. 1, ¶ 30). AIG asks for summary judgment as to this claim because J&M "has failed to establish the requisite elements to recover on its claim that [AIG] breached the VEBA Plan's hardship rider" as "the hardship rider was not properly invoked" and "[J&M] never properly exercised the VEBA Plan's termination procedures and nothing is preventing Plaintiff from exercising the Plan's provisions now." (Doc. 160, pp. 12-15; Doc. 192, pp. 17-18). This court finds AIG's argument persuasive.

First, the Master Plan provides that a party may terminate its participation in the Plan, but the party must provide such request in writing to the Committee which is then forwarded to the Trustee. (See Doc. 159-9, pp. 20-21). Each participating employer who adopts the VEBA Plan shall irrevocably appoint members to a master committee with membership set forth in the Adoption Agreement. (Id., p. ). The Adoption Agreement which was signed by John Wilks appoints Mark Callahan and Brady Richardson as committee members. (Doc. 185-2, p. 4). J&M has not provided, nor can this court find, any evidence that J&M gave written notice that it wished to terminate its participation in the VEBA plan. Furthermore, neither the Master Plan nor the Adoption Agreement provides for any other type of restructuring.

Second, as stated above, the insurance policies contain a hardship rider which states that "the Owner may apply for an exchange in the event of Substantial Business Hardship" (Doc.

159-16, p. 2), but to receive said exchange, "the Owner must furnish evidence satisfactorily to the Company that:

> (1) The Owner is unable to make premium payments without a Substantial Business Hardship; and
>
> (2) The failure to make premium payments would be adverse to the interests of the Owner.
>
> (Id., p. 3).

The policies identify the owner of the policy as "Union Bank of CA", which is the Master Trust. (Doc. 187-1, p. 5; Doc. 159-11, p. 32). While the Wilkses had contacted AIG concerning a readjustment to the policies, J&M has not provided, nor could this court find, any evidence that the Master Trust requested to invoke the hardship rider. In fact, AIG wrote a letter to J&M specifically telling it that the Master Trust must make such a request, but the undisputed evidence shows that the Master Trust never did so.

In sum, viewing the evidence in a light most favorable to J&M, this court finds that a trier of fact could not reasonably conclude that AIG breached the Master Plan, the Adoption Agreement, or the insurance policies. All of the parties fulfilled their obligations pursuant to the express terms of the contracts, J&M did not terminate its participation in the Master Plan, and the hardship rider was never exercised. Therefore, summary judgment as to Count One is due to be granted.

### III. Agency Relationship

In Counts Two, Four, and Five of the complaint, J&M alleges that AIG is liable for negligence, fraud, and fraudulent concealment respectively because Mark Callahan, Lalat Pattanaik, Brady Richardson, and Michael Mangawang, as agents for AIG, made certain misrepresentations to or suppressed certain facts from the plaintiff. (Doc. 1, pp. 16-24). AIG asks for summary judgment because "the evidence is insufficient to establish an agency

relationship between [AIG] and Brady [], Lalat [], Mark [], and Michael [], either actual or apparent" thus AIG "cannot be liable for their actions." (Doc. 160, p. 16). The court agrees with AIG's arguments as to Brady Richardson, Mark Callahan, and Michael Mangawang.[10] The court, however, disagrees as to Lalat and finds that there is a genuine issue of material fact as to whether Lalat was acting as a subagent so that his alleged misconduct might be imputed on AIG.

"The law regarding the responsibility of a principal for persons allegedly appointed as subagents is well settled." Booker v. United American Insurance Co., 700 So.2d 1333, 1335 (Ala. 1997). "'When one employs an agent who has either express or implied authority to employ a subagent, the subagent will also be the agent of the principal. … [However, t]he act of a subagent will not bind the original principal where the appointment of such subagent was not by authority, express or implied, or was not subsequently ratified by the principal…'" Id. (citations omitted). In other words, "a principal will be bound by the acts of a purported subagent only if: (1) the agent had express authority to appoint the subagent; (2) the agent had implied authority to appoint the subagent; or (3) the principal ratified the appointment." Id. at 1335-1336(citing Consolidated Underwriters Ins. Co. v. Landers, 285 Ala. 677, 681, 235 So.2d 818, 822 (Ala. 1970); Eagle Motor Lines v. Hood, 256 Ala. 395, 398, 55 So.2d 126, 129 (Ala. 1951); Butler v. Standard Life Ins. Co. of the South, 232 Ala. 238, 167 So. 307, 309-310 (Ala. 1936)).

---

[10] The plaintiff does not dispute AIG's arguments as to Brady Richardson, Mark Callahan, and Michael Mangawang in its response. (See Doc. 170, pp. 27-32). In its supplemental brief, J&M again does dispute AIG's arguments but rather states in a footnote that "[t]he Factual Narrative does not focus entirely on Lalat but also contains many facts directly relating to Callahan's representations and active involvement in marketing VEBA Plans" and that "[t]he facts show Richardson participated, as well as Mangawang." (Doc. 197, pp. 12-13 & n. 12). While it is true that all of these individuals were part of the transaction above, this court finds that the "factual narrative" does not establish that they had the actual or implied authority to be deemed an agent of AIG.

AIG asserts that the contract between AIG and Innovative "refutes" the assertion that Innovative "was a Master General Agent of [AIG] with the authority to appoint subagents, including IPS… and Lalat…" (Doc. 192, p. 15). While it is true that AIG may not have provided express authority to Innovative to appoint Lalat as the subagent,[11] the court finds that a trier of fact could reasonably conclude that either AIG provided Innovative the implied authority to appoint Lalat or, at the least, ratified the appointment of Lalat. For instance, it is undisputed that Lalat had discussions with several AIG personnel "[o]n an ongoing basis… and extensively" about the financial concepts he marketed. (Doc. 171-1, Lalat. Dep., pp. 11-12; Doc. 172-1, Lalat Dep., p. 25; Doc. 178-1, Robinson Dep., p. 10). Also, Lalat, his brothers and staff  met regularly with Peter Mordin, who is the National Marketing Director for AIG. (Doc. 172-1, Lalat Dep., p. 17; Doc. 182-1, p. 11). Furthermore, Lalat testified that Peter Mordin and David Robinson, who had served as senior counsel to AIG and also as advance sales counsel, were not only aware of and never objected to Lalat's marketing strategy but also allowed Lalat to use AIG-generated marketing materials and software to use in his marketing. (Doc. 173-1, Lalat Dep., p. 6-7, 12, 21-23). Lalat also testified that AIG would routinely request documents from Lalat. (See Doc. 171-1, Lalat Dep., pp. 17-18 & 25-26). While AIG's arguments may be persuasive to the trier of fact and ultimately victorious at trial, the court finds that, viewing the facts in a light most favorable to the plaintiff, a trier of fact could reasonably conclude that AIG ratified Innovative's

---

[11] The Master General Agent Contract between Innovative and AIG gave Innovative the authority to "recruit and recommend persons to [AIG]" but required that AIG "determine whether to offer such persons (agents) the rights to production under an agent contract with [AIG]." The contract further provided that "[n]o agent contract shall be effective until [AIG] has approved and appointed the recommended person and issued an appropriate contract." (Doc. 193-1, p. 3). The Supreme Court of Alabama found in Booker v. United American Ins. Co. that a principle did not give express authority to an agent to appoint subagents since the contract between the principal and the agent specifically provided that the agent could only recommend subagents until they were authorized by the principal. 700 So.2d 1333, 1336 (Ala. 1997).

appointment of Lalat as a subagent.  Therefore, summary judgment as to Counts Two, Three, and Five are due to be granted as to any misrepresentations or suppressions by Mark Callahan, Brady Richardson, and Michael Mangawang, but summary judgment based on this argument is due to be denied as to any misrepresentations or suppressions by Lalat Pattanaik.

## IV. Reasonable Reliance

As stated above, in Counts Two, Four, and Five of the complaint, J&M alleges that AIG is liable for negligence, fraud, and fraudulent concealment respectively.  (Doc. 1, pp. 16-24).  AIG asks for summary judgment as to these counts "because Plaintiff could not have reasonably relied on purported oral misrepresentations made by the alleged agents that contradicted the clear and unambiguous terms in the VEBA Plan documents."  (Doc. 160, p. 21).

## 1. Fraud (Count Four)

In order to recover for fraud under Alabama law, J&M needs to establish (1) that AIG made a false representation, (2) that the misrepresentation involved a material fact, (3) that the insureds relied on the misrepresentation, and (4) that the misrepresentation damaged the insureds.  AmerUS Life Ins. Co. v. Smith, 5 So.3d 1200, 1207 (Ala. 2008)(citing Liberty Nat'l Life Ins. Co. v. Ingram, 887 So.2d 222, 227 (Ala. 2004); Ala. Code § 6-5-101 (1975)).  "Moreover, a plaintiff must prove that he or she reasonably relied on the defendant's misrepresentation in order to recover damages for fraud."  Id.  As explained by the Alabama Supreme Court,

> Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.  In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances.  If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true

facts, the plaintiffs should not recover. Bedwell Lumber Co. v. T & T Corp., 386 So.2d 413, 415 (Ala. 1980).

> "If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti [sic] non fit injuria." Munroe v. Pritchett, 16 Ala. 785, 789 (1849).

Torres v. State Farm Fire & Casualty Co., 438 So.2d 757, 758-759 (Ala. 1983).

In Foremost Insurance Co. v. Parham, the Alabama Supreme Court overruled Hickox v. Stover, 551 So.2d 259 (Ala. 1989), in which the court had adopted a "justifiable-reliance" standard under which the plaintiff, to recover on a fraud cause of action, had to prove only that he or she had justifiably relied on the defendant's misrepresentation. 693 So.2d 409 (Ala. 1997).

In Foremost, the Alabama Supreme Court concluded that:

> [T]he "justifiable reliance" standard adopted in Hickox, which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the "reasonable reliance" standard most closely associated with Torres… The "reasonable reliance" standard is, in our view, a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the "reasonable reliance" standard will once again provide a mechanism… whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

> Foremost, 693 So.2d at 421

"Therefore, in order to satisfy the reliance element of [its] fraud claim, the insureds must show not only that they relied on [AIG's] misrepresentation, but also that their reliance was reasonable in light of the facts surrounding the transaction in question." AmeriUS Life Ins. Co., 5 So.3d at 1208.

AIG contends that the above count for fraud fails because J&M could not have reasonably relied on misrepresentations made by Lalat because J&M had a duty to read the documents presented to it and those documents refute any misrepresentations made. (Doc. 160, pp. 21-29). "The return to the reasonable-reliance standard imposes again on a plaintiff a 'general duty… to read the documents received in connection with a particular transaction," Foremost, 693 So.2d at 421, together with a duty to inquire and investigate." Id. In other words, "[f]raud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered." Gonzales v. U-J Chevrolet Co., 451 So.2d 244, 247 (Ala. 1984). The Alabama Supreme Court has stated that "[w]hen reviewing a plaintiff's actions pursuant to the reasonable-reliance standard, … a plaintiff who is capable of reading documents, but who does not read them or investigate the facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents." AmerUS Life Ins. Co., 5 So.3d at 1208.[12] In general, J&M asserts three general groups of

---

[12] Relying on Ex parte Seabol, 782 So.2d 212 (Ala. 2000) and Potter v. First Real Estate Co., 844 So.2d 540 (Ala. 2002), J&M argues that whether they could have reasonably relied on AIG's alleged agents' misrepresentations is a question of fact to be put to a jury since the present transaction was a "complex transaction" which is a "carve out" exception to Foremost. (Doc. 170, pp. 33-34; Doc. 197, pp. 9-10). This court disagrees. First, the documents at issue in the present case are "easily understandable." As the Alabama Supreme Court explained in Seabol, the plaintiffs in Foremost "could have easily read" the documents in question and determined that their "failure to read the insurance documents would not have tolled the running of the limitations period, under the reasonable-reliance standard," but that a different result could arise under application of that standard in a case where such as in Seabol, "the documents at issue are not as easily understood." 782 So.2d at 216. The documents in the present case – the Master Plan, the Adoption Agreement, the insurance policies, and the Romero letter – clearly set forth the rights of the parties, the benefits that J&M was to receive, and the risk involved in participating in such a plan. Second, J&M used its own advisors in its decision to enroll in the (Continued)

misrepresentations made by Lalat, statements which concern (1) the purpose of the VEBA Plan;

(2) the tax attributes of the VEBA Plan; and (3) the flexibility of the VEBA Plan.

### a. The Purpose of the VEBA Plan

In its complaint, J&M maintains that the following misrepresentations occurred in regards to the purpose of the VEBA plan:

> At the times alleged herein, and on more than one occasion, Callahan, Pattanaik, Richardson and Mangawang, acting as agents for AIG represented that the insurance policies selected were suitable for the purposes described and for J&M's needs… that the previously paid contributions were secure… that the tax-free monies would be paid to the beneficiaries at a future date… that certain modified whole life insurance policies purchased by the Trustee could be distributed to the insured participants at substantially reduced surrender value…

> These Defendants further represent that the Plan offered an excellent investment opportunity… that the Plan was discriminatory as to the choice of products between employees, that the Plan offered tax free withdrawals as deferred compensation plus permanent life insurance…

> (Doc. 1, pp. 20-21).

In regards to what J&M was expecting, John Wilks testified that he entered into the VEBA Plan hoping that "the VEBA Plan was going to be the catalyst that… provides us with retirement, and the payout over the rest of our life, not an insurance policy." (Doc. 159-3, J. Wilks Dep., p. 23; see also Id., p. 15; Doc. 159-4, J. Wilks Dep., p. 12). AIG argues that the Adoption Agreement, Master Plan, and the insurance policies contradict the above misrepresentations or at least provoke inquiry, thus J&M could not have reasonably relied on these particular misrepresentations to the contrary. (Doc. 160, pp. 23-24). This court agrees with AIG and finds

---

plan. Third, Seabol and Potter were real estate cases, and this court has not found, nor has J&M cited, any insurance or financial cases that would persuade this court to reach a different result.

that J&M, through ordinary prudence, ought to or should have discovered from these documents that Lalat's alleged misrepresentations as to the purpose of the VEBA plan were contradictory.

As stated above in the breach of contract discussion, the Master Plan, Adoption Agreement, and insurance policies are unambiguous. The Master Plan and Adoption Agreement expressly provide that J&M will send money to the Master Trust and that the Master Trust will, in turn, purchase and then fund a life insurance policy for John Wilks, Mike Wilks, Billy Wilks, and any other participating employee. The Trustee thereafter received, and AIG issued, three separate policies insuring the lives of John, Mike, and Billy, policies which were received by J&M. The written policies unambiguously state that the Master Trust must pay a specified amount per year till each participant reaches 100 or dies and upon those milestones, the policies provide benefits to the beneficiaries of John, Mike, and Billy. The above documents clearly set forth that the funds paid to the Master Trust would only be used to purchase life insurance. Therefore, this court finds that J&M, through ordinary prudence, ought to or should have discovered from these documents that Lalat's alleged misrepresentations contradicted the documents that clearly state J&M was merely purchasing life insurance. As such, summary judgment is due to be granted as to Count Four in regards to any alleged misrepresentations concerning the purpose of the VEBA plan.

### b. Tax Issues

In its complaint, J&M maintains that the following misrepresentations occurred concerning the tax consequences of the plan contributions and the tax status of the VEBA Plan:

> At all times alleged herein, and on more than one occasion, Callahan, Pattanaik, Richardson and Mangawang, acting as agents for AIG represented… that the Plan was not a Reportable and Listed Transaction, that the above described lifetime tax exempt tax benefits were available under the Plan… and that the Plan had been approved by the IRS…

These Defendants further represent that the Plan provided a way to purchase life insurance on a tax-favorable basis, that the Plan was designed as a tax shelter with deferred compensation features… that J&M would be entitled to current income tax deductions for all contributions, that the plan was not a Reportable and Listed Transaction, and that the Plan had been approved by the Internal Revenue Service.

(Doc. 1, pp. 20-21).

AIG asks for summary judgment because J&M "cannot establish that it reasonably relied on Defendants regarding to the tax treatment of its contributions, because the express terms of the Adoption Agreement contradict any alleged oral misrepresentation." Specifically, AIG points to a provision of the Adoption Agreement "which very closely disclosed that that the Plaintiff alone would assume responsibility for the tax consequences associated with the Plan." (Doc. 160, p. 24; see also Doc. 192, pp. 7-8). AIG also maintains that Fredrick Romero, an attorney hired by the plaintiff, "made clear in his written legal opinion that J&M's Plan contributions would 'more likely than not' be viewed by the IRS as tax deductible" (Id., p. 25) and that "Bill Wilks admitted that he understood Romero's opinion to say that the VEBA Plan [and contributions] had only a '50/50 chance' of surviving IRS scrutiny and that he himself could have made that determination!" (Doc. 192, p. 6). Lastly, AIG has directed the court to the Letter of Determination which states that "'No opinion is expressed or implied as to whether employer contributions… are deductible under the Code" and to the previously-mentioned Romero opinion letters. (Doc. 160, pp. 28-29).

The court finds AIG's arguments persuasive. The written disclaimer in the Adoption Agreement signed by John Wilks clearly explains that the plaintiffs assume responsibility for the tax responsibilities of the plan, and many of the materials provided to J&M explicitly state that they should consult their own legal and tax advisors. Furthermore, Mr. Romero, an attorney who was hired by J&M, provided that it was "more likely than not" that the VEBA plan and the

contribution thereto would pass IRS muster and also maintained that "it is possible that the

Internal Revenue Service could disagree with our position as our position is not binding on the

IRS." (Doc. 159-17, p. 18). When asked whether the "more likely than not" language was "an

acceptable level of risk for J&M, John Wilks testified that "Yeah. Yes, it was." (Doc. 159-3, pp.

28-29), and Bill Wilks admitted that he understood that "more likely than not" meant only a

"50/50 chance." (Doc. 159-19). This court finds that the plaintiffs cannot show reasonable

reliance on these facts, thus the defendants are entitled to summary judgment on Count Four as

to any alleged misrepresentations as to any tax issues. See Omni Home Financing. Inc. v.

Hartford Life and Annuity Ins. Co., slip op., 2008 WL 1925248, at *5 (S.D.Cal. Apr. 29,

2008)(found the plaintiffs could not have reasonably relied on tax advice by the defendants

because it signed disclaimers that clearly explained the plaintiffs should not rely on defendants

for legal and tax advice and that they should consult their own legal and tax advisors).

### c. Flexibility of the VEBA Plan

In its complaint, J&M asserts that the following misrepresentations occurred with respect

to the flexibility of the VEBA Plan:

> At the times alleged herein, and on more than one occasion, Callahan, Pattanaik,
> Richardson and Mangawang, acting as agents for AIG represented… that the
> policies were flexible and could be restructured so that annual payments could be
> suspended or reduced in the event of economic hardship… that the Plan could be
> terminated for economic hardship with benefits distributed to participating
> employees… that the policies of insurance contained a hardship rider which
> provided flexibility in the amount of premiums paid when invoked…

> Moreover, Callahan, Pattanaik and Richardson represented to J&M that the
> policies of insurance contained a hardship rider that provided flexibility in the
> amount of premiums paid when invoked, and that the Plan allowed participants to
> restructure payments by suspending or reducing them in the event of an economic
> hardship until such time J&M could continue participation, or terminate the Plan
> with benefits distributed to the participating employees…

> (Doc. 1, pp. 20-21).

AIG asks for summary judgment as to these misrepresentations because "[a]gain, the underlying documents signed and adopted by J&M clearly contradict this assertion." (Doc. 160, p. 26). This court agrees. First, Johnny Wilks signed the Benefits Disclosure that provided that the Policies could be converted upon employee withdrawal due to hardship if the minimum funding period of five years had been met, an occurrence which indisputably did not occur. (See Doc. 159-7, p. 2). Second, the Master Plan and the insurance policies set forth the exclusive means by which J&M could terminate its participation in the VEBA Plan or invoke the hardship rider, respectively. In light of the foregoing, the court finds that J&M, through ordinary prudence, ought to or should have discovered from these documents that AIG's agent's alleged misrepresentations - - that the VEBA Plan and corresponding policies were more flexible than what was set forth in the contracts - - were fraudulent. As such, summary judgment is due to be granted as to Count Four with regard to any alleged misrepresentations as to the flexibility of the VEBA plan. In sum, summary judgment as to Count Four is due to be granted in its entirety.

### 2. Negligence (Count Two) and Fraudulent Concealment (Count Five)

In Count Two of its complaint, J&M asserts that AIG and the other defendants "owed a duty of due care to J&M to know and understand the Plan, to know and understand the insurance policies being sold to J&M, and to provide the type of policies that were suitable to J&M's needs…" and that by its "conduct, the Defendants committed significant errors and omission in carrying out said duty to J&M, and as a result of said negligent conduct, J&M has suffered damages." (Doc. 1, p. 18). In Count Five of its complaint, J&M maintains that "[t]he Defendants fraudulently concealed material facts from J&M" and that it was damaged by this concealment. (Doc. 1, pp. 23-24). AIG asks this court to enter summary judgment as to Counts Two and Five for the same reasons as the fraud count above. In other words, AIG asserts that

Counts Two and Five should be dismissed "because Plaintiff could not have reasonably relied on purported oral misrepresentations made by the alleged agents that contradicted the clear and unambiguous terms in the VEBA Plan documents." (Doc. 160, p. 21).

"In any negligence case, the plaintiff bears the burden of proving the existence of a duty owed by the defendant, a breach of that duty, causation, and damage.'" DGB, LLC v. Hinds, --- So.3d ---, 2010 WL 2629411, at *15 (June 30, 2010)(quoting Glass v. Birmingham Southern R.R., 905 So.2d 789, 794 (Ala. 2004)). Alternatively, "[t]he elements of a claim of fraudulent suppression are: '(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.'" DGB, LLC v. Hinds, -- So.3d --, 2010 WL 2629411, at *11 (Ala. 2010)(quoting Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So.2d 883, 891 (Ala. 2005)(other citations omitted)). While there is no question that "reasonable reliance" is an element of a "fraud" claim, this court has not found, nor has AIG cited, any support for the proposition that reasonable reliance is an element of or a defense to a negligence claim or a fraudulent concealment claim. As such, AIG's motion for summary judgment on this ground is due to be denied.[13]

---

[13] AIG also attempts, for the first time in its reply, to seek summary judgment as to J&M's negligence claim, asserting that AIG "had no duties to J&M outside of those provided in the Polices of insurance on the lives of the Wilkses." (Doc. 192, p. 17). As a procedural matter, this argument is not properly raised because AIG raised it for the first time in its reply brief. "As defendants well know, new arguments are impermissible in reply briefs." Abrams v. Ciba Specialty Chemicals Corp., 663 F.Supp.2d 1220, 1232 n. 16 (S.D.Ala. 2009)(citing see e.g., Evans v. Infirmary Health Services, Inc., 634 F.Supp.2d 1276, 1285 n. 14 (S.D.Ala. 2009)("this Court's general practice is not to consider new arguments raised in a reply brief"); Fisher v. Ciba Specialty Chemicals Corp., 238 F.R.D. 273, 317 n. 89 (S.D.Ala. 2006)("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief").

## V. Statute of Limitations

AIG argues that Count Two, Count Three, and Count Five, alleging negligence, wantonness, and fraudulent concealment respectively, should be dismissed "because the Plaintiff waited until after the expiration of the statute of limitations to file its claim." (Doc. 160, p. 29-31). These three claims are governed under Alabama law by a two-year statute of limitations.[14] See Ala. Code § 6-2-38. J&M maintains that the statute of limitations was tolled pursuant to Alabama Code § 6-2-3 "because of AIG's on-going concealment of true facts." (Doc. 170, pp. 37-38).

Section 6-2-3 provides that "[i]n actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." Ala. Code § 6-2-3. In other words, "[t]he two-year statute of limitations in a fraud case begins to run when the plaintiff discovered the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care." Waldrup v. Hartford Life Ins. Co., 598 F.Supp.2d 1219, 1229 (N.D.Ala. 2008)(citing Ala. Code § 6-2-3; Gray v. Liberty National Life Insurance Co., 623 So.2d 1156, 1159 (Ala. 1993)). Section 6-2-3 can be applied to fraud and non-fraud (negligence and wantonness) claims if the cause of action

---

[14] J&M cites Walker v. Capstone Building Corp., -- So.3d --, 2010 WL 1170094 (Ala.Civ.App. Mar. 26, 2010) in support of its argument that J&M's wantonness claim carries a six-year statute of limitations. (Doc. 170, p. 39 n. 20). J&M's reliance on this case, however, is misplaced. Unlike Walker, where the court applied the six-year statute of limitations for trespass to the plaintiff's wantonness claim because he was injured when he stepped into a partially-covered manhole at a construction site, J&M has not alleged personal injury as a result of AIG's purported conduct. Therefore, this court finds that the two-year limitations period governing fraud should apply to J&M's wantonness claim.

was fraudulently concealed from the plaintiff.  Rutledge v. Freeman, 914 So.2d 364, 359

(Ala.Civ.App. 2004).

"The question of when a plaintiff discovered or should have discovered an alleged fraud,

for statute of limitations purposes, is generally one for the jury.  Id.(citing Ex Parte American

General Finance, Inc., 795 So.2d 685, 689 (Ala. 2000)).  "However, the Alabama Supreme Court

has recognized that, under certain circumstances, this question may be decided as a matter of

law."  Id.  "'A party will be deemed to have "discovered" a fraud as a matter of law upon the

first of either the actual discovery of the fraud or when the party becomes privy to the facts that

would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of

the fraud.'" Jones v. Kassouf & Company, P.C., 949 So.2d 136, 140 (Ala. 2006)(quoting

Dickinson v. Land Developers Construction Co., 882 So.2d 291, 298 (Ala. 2003)).  The Alabama

Supreme Court described this Foremost objective standard as follows:

> The question of when a plaintiff should have discovered fraud should be taken
> away from the jury and decided as a matter of law only in cases where the
> plaintiff actually knew of facts that would have put a reasonable person on notice
> of fraud.  This Court has explained that it is the knowledge of such facts that
> would have alerted a reasonable person to the existence of a potential fraud, and
> not actual knowledge of the fraud itself, that determines whether the question of
> the tolling of the limitations period in a fraud case [under § 6-2-3] can be decided
> as a matter of law.  As a corollary to this rule, we have held that fraud is
> discoverable as a matter of law for the purposes of the statute of limitations when
> one receives documents that would put one on such notice that the fraud
> reasonably should be discovered.

> Ex Parte American General Finance, Inc., 795 So.2d at 689-690 (internal
> quotations and citations omitted; last emphasis added).

AIG contends that the above counts fail because "the statute of limitations began to run

when the Plaintiff received written disclosures that contradicted purported oral representations

made by alleged [AIG] agents."  (Doc. 160, p. 29)(citations omitted).  This court agrees as to

most of the claims.  As described above as to the fraud count, J&M also bases, in part, its

negligence, wantonness, and fraudulent concealment claims on the same three general grounds: (1) the express representations or omissions by Lalat of information relating to the purpose of the VEBA Plan; (2) the express representations or omissions by Lalat of the taxability of the VEBA plan contributions and the tax status of the VEBA plan itself; and (3) the express representations or omissions by Lalat of information relating to the flexibility of the plan.  For the same reasons stated supra with regard to the fraud claim, the court finds that J&M was placed on notice that the fraud in the above situations should have been discovered when it received the Master Plan, the Adoption Agreement, the insurance policies, and Mr. Romero's opinion letter in 2004.  Since J&M did not file its lawsuit until December 21, 2007, J&M's claims for negligence, wantonness, and fraudulent concealment that are based on the above express representations and alleged concealment are barred by the two-year statute of limitations.

J&M, however, also bases its claims on Lalat's concealment of certain information concerning the taxability of the VEBA Plan contributions and the tax status of the VEBA plan. In particular, J&M points in its response to the following two instances of omission/concealment of information relating to taxability issues of the VEBA Plan: (1) "[t]here are no documents presented to J&M which informed its officers that the IRS had determined the VEBA Plan was in violation of the final regulations issued in July 2003.  AIG's agents did not include the final regulations in the Due Diligence Package, even though Robinson, Mordin, Innovative, Lalat, and AIG executives knew the final regulations existed."; and (2) "AIG's agents did not include Ashton's January 27, 2004, letter in the Due Diligence Package, even though Lalat admitted the letter is important… AIG's agents did not disclose to J&M that Ashton (AIG's attorney) concluded the VEBA Plan had defects rendering it non-compliant.  Instead, other misleading letters by Ashton were included in the Package presented to J&M."  (Doc. 170, pp. 32-33).   As

to these two specific instances of concealment, this court does not find that any of the documents given to J&M put it on notice that Lalat and AIG were concealing material tax information from J&M.  Since there is a genuine dispute as to when J&M was placed on notice of these omissions, summary judgment as to J&M's negligence, wantonness, and fraudulent concealment claims that are based on concealment of the final regulations and/or the January 27, 2004, letter is due to be denied.

## VI. Wantonness (Count Three)

AIG also asks this court to grant summary judgment as to J&M's wantonness claim because "Plaintiff cannot establish that American General engaged in wanton conduct…"  (Doc. 160, p. 31).   The Alabama Code defines wantonness as "[c]onduct which is carried on with reckless or conscious disregard of the rights or safety of others."  Ala. Code § 6-11-20(b)(3).  For a party to be found guilty of wantonness, it must be shown that with reckless indifference to the consequences of its action, the party consciously and intentionally did some wrongful act or omitted some known duty, and that this act or omission caused the injury.  Kennedy v. Jack Smith Enterprises, Inc., 619 So.2d 1326, 1328 (Ala. 1993)(citing Brown v. Turner, 497 So.2d 1119 (Ala. 1986).  Since this court granted summary judgment as to most of the bases of J&M's wantonness claim, this argument only applies to AIG's and Lalat's concealment of the final regulations and/or the January 27, 2004, letter.

AIG first argues that "there is no evidence to establish that… Lalat Pattanaik… w[as an agent] of American General for the purpose of the transaction in question."  (Doc. 160, p. 30).  For the same reasons stated supra, this court finds that a trier of fact could reasonably conclude that AIG ratified Innovative's appointment of Lalat as a subagent.  Second, AIG maintains that its "only role in the transaction was providing Policies of insurance on the lives of Bill, Johnny,

and Mike Wilks at the direction of the VEBA Plan, and there is no evidence to suggest that American General did not perform as required by the Policies."  (Doc. 160, pp. 30-31).  This court disagrees.  There is sufficient evidence that AIG and Lalat had knowledge of the information that was later concealed from J&M, that Lalat consciously and intentionally did not present the information to J&M, and that J&M was damaged by this concealment of this information.  Since AIG has failed to show that there is no genuine dispute as to any material fact, summary judgment as to J&M's wantonness claim that is based on AIG's and Lalat's concealment of the final regulations and/or the January 27, 2004, letter is due to be denied.

## VII. Civil Conspiracy (Count Six)

AIG asks for summary judgment as to Count Six of J&M's complaint because "J&M has not stated any claim for any underlying wrong", "a claim for conspiracy cannot stand either." (Doc. 160, p. 31).  The Alabama Supreme Court has made clear that "a conspiracy itself furnishes no cause of action.  The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed… If the underlying cause of action is not viable, the conspiracy claim must also fail."  Allied Supply Co., Inc. v. Brown, 585 So.2d 33, 36 (Ala. 1991).  As to all the underlying claims that this court has found summary judgment was due to be granted above, summary judgment is due to be granted as to Count Six.  However, as discussed supra, J&M has an underlying claim for negligence, wantonness, and fraudulent concealment based on AIG's and Lalat's omission/concealment of the final regulations and/or the January 27, 2004, letter.  Therefore, as to that specific claim, J&M has a claim for civil conspiracy and summary judgment is due to be denied.[15]

---

[15] Like its argument as to its duty under J&M's negligence claim, AIG also attempts, for the first time in its reply, to seek summary judgment as to J&M's civil conspiracy claim, (Continued)

## VIII.  IRS 6707A penalties

AIG asks for this court to grant summary judgment arguing that J&M "cannot claim 6707A penalties as damages" because those damages "are too speculative" since "[t]he IRS has assessed, but J&M has not paid, 6707A penalties in the amount of $400,000" and "[l]egislation has passed the Senate and the House of Representatives that may eliminate J&M's 6707A penalties."  (Doc. 160, p. 31-32).  This court finds that the damages are not speculative simply because J&M has not paid the penalties, especially since the IRS has determined a specific amount owed and the case allegedly has been transferred to another Revenue Agent for collection.  (See Doc. 170, p. 40).  With regard to the pending legislation, this court recognizes AIG's notice of additional authority filed on September 28, 2010, that stated "[o]n September 27, 2010, President Obama signed into law H.R. 5297, the Small Business Jobs Act of 2010" and in that legislation, "Section 2041 of H.R. 5297 amends IRC § 6707A to limit penalties for failure to disclose reportable transactions and listed transactions for penalties assessed after December 31, 2006."  (Doc. 204).  A ruling on this particular issue is clearly premature due to this new legislation and the fact that J&M has not had a full opportunity to address AIG's new argument. (See Doc. 206).  Therefore, this court shall reserve its ruling on this specific ground until each party is allowed to fully address it.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is

**ORDERED** that the defendant's motion for summary judgment is **GRANTED** as to Count One

---

asserting that specific claim is "also governed by the two-year statute of limitations and, for the same reasons, is barred."  (Doc. 192, p. 14).  As stated above, this court will not address this argument because as a procedural matter, this argument is not properly raised since AIG raised it for the first time in its reply brief.

and Count Four and **GRANTED IN PART AND DENIED IN PART** as to Count Two, Count

Three, Count Five, and Count Six.  The only remaining issues for trial are whether AIG is liable

for negligence, wantonness, fraudulent concealment, and/or civil conspiracy when Lalat

Pattanaik allegedly concealed from J&M (1) the final regulations issued in July 2003; and/or (2)

the January 27, 2004, letter by Bruce L. Ashton of Reish, Luftman, Reicher & Cohen.   J&M's

motion for reconsideration (Doc. 209) is therefore **MOOT**.

      **DONE and ORDERED** this 12th day of November, 2010.

                         /s/  Callie V. S. Granade
                         UNITED STATES DISTRICT JUDGE